STATE OF VERMONT

ENVIRONMENTAL COURT

| | } | |
|---|---|---|
| Appeals of Wesco, Inc. | } | Docket Nos. 209-12-97 Vtec, 215-9-00 Vtec, 222-9-00 |
| Vtec, | | |
| | } | 175-10-01 Vtec and 24-1-02 Vtec |
| | } | |

Decision and Order

Appellant-Applicant Wesco, Inc. (Applicant) is represented by Jon Anderson, Esq. and William Simendinger; the City of Barre is represented by Oliver L. Twombly, Esq. Interested persons Marjorie Sichel, Eugene Clermont, and Percy Labor represent themselves.

These consolidated cases have involved, over time, the following docket numbers. Docket Nos. 10-1-96 Vtec and 75-5-96 Vtec (formerly E96-010 and E96-075) (the 1996 cases) involved the first round of site plans for the site. The Court ruled on the merits of these two cases in 1998, after nine days of evidentiary hearings. These two cases were the subject of the Supreme Court=s memorandum decision in Simendinger v. City of Barre, 171 Vt. 648 (2001), which affirmed this Court=s decision in part, and reversed and remanded it in part. The Supreme Court affirmed the Court=s determination that the repair garage qualifies as a pre-existing, non-complying structure, housing a non-

conforming use. The majority also affirmed the Court=s determination that the proposed neighborhood grocery store met the criteria of '5.14.02(c), subject to Applicant=s obtaining conditional use approval of the neighborhood grocery store proposal. The Supreme Court reversed and remanded the remainder of the 1998 decision for the municipal boards to consider Applicant=s applications for conditional use approval and site plan approval on their merits.

The parties agreed to the closure of the two 1996 cases on the Court=s docket, with all the evidence taken in those cases being transferred to the current cases for consideration on their merits. In the above-captioned cases, a number of legal issues were addressed by summary judgment in a decision issued August 7, 2002. Supplemental evidentiary hearings were held in 2003 over the course of nine additional days. Docket Nos. 215-9-00 Vtec and 222-9-00 Vtec involve a second round of site plan proposals for the site. Docket Nos. 209-12-97 Vtec (formerly 115-3-95 Wncv) and 175-10-01 Vtec involve the conditional use application. Docket No. 24-1-02 Vtec involves the third round of site plans for the site.

In the consolidated cases, Applicant seeks conditional use approval and site plan approval for proposed changes to its property at 169 Washington Street in a Planned Residential zoning district in the city of Barre. Applicant proposes to convert the use of

the existing building on the property from an automobile repair garage[1] to a neighborhood grocery store[2] (convenience store), and to make associated changes in the building, keeping the same footprint, and to make associated changes to the site=s lighting, landscaping and parking. Specifically, Applicant proposes to convert the existing number of gasoline dispensers from full-service operation (operation of the dispensers by employees) to self-service operation by customers; proposes to sell convenience store items from the building, including deli sandwiches and other prepared foods; proposes to remodel the interior of the building and the doors and windows to eliminate the service bays and accommodate the proposed convenience store uses; proposes to raise and alter the roof shape and height; and proposes to construct a canopy over the existing pump island.

---

[1] An additional case not now under consideration, Docket No. 150-9-01Vtec, involves issues regarding whether the automobile service component of this operation was abandoned.

[2] The term Aneighborhood grocery store@ is the use category used in the Zoning Regulations; the term Aconvenience store@ is the term used in the industry and in the transportation engineering categories. Both terms are used in this decision. We note that nothing in the Zoning Regulations distinguishes between neighborhood grocery stores that are locally-owned and those that are owned or franchised by statewide, regional or national companies or chains.

The evidentiary hearings in 1997 and in 2003 were held in this matter before Merideth Wright, Environmental Judge, who also took a site visit alone, by agreement of the parties. The parties were given the opportunity to submit written memoranda and requests for findings. Upon consideration of all the evidence, as illustrated by the site visit, and of the written memoranda and requests for findings filed by the parties, the Court finds and concludes as follows.

Since before the enactment of zoning in Barre in 1974, Applicant=s property has contained an automobile repair garage and a four-fueling-position gasoline station on a single gasoline island. The property line at the Washington Street frontage is located parallel to and approximately 72 feet (by scale from the site plan) from the curb marking the edge of the street. Under the Zoning Regulations, setbacks are measured from the property lines, not from the traveled way of the street. The existing building is located approximately 122 feet from the front property line, and is located from 72 feet to fifteen feet from the easterly side property line. The existing gasoline pump island is located approximately ten feet from the front property line. The lot is approximately 16,000 square feet in area, and contains a relatively flat area extending approximately one hundred feet back from Washington Street to the beginning of the existing tree line, beyond which it slopes steeply downwards in back towards Orange Street.

The existing light over the pump island is outdated both as to its engineering and its design. Because the bulb or light source is visible, rather than shielded within a downcast light fixture or canopy, it produces glare visible to pedestrians, drivers of vehicles, and neighborhood residents, by having a visible bulb or light source and one that is of a relative high wattage. Because it is not shielded upwards or to the sides, it also produces light extending unnecessarily far from the pump island and fueling positions.

The existing parking of vehicles awaiting repair on the site is haphazard and in the winter tends to become snowed into those positions for a relatively long period of time. The large number of vehicles awaiting repair and parked outside is incompatible with the appearance of a residential neighborhood, and is visible viewed down Charles Street from above, as well as from Washington Street. A storage trailer parked behind the building is visible from Orange Street and by pedestrians on or near the property, and contributes to the cluttered appearance of the property. The building is in need of maintenance. During its hours of operation, a repair garage use creates noise from power and pneumatic equipment, and may create fumes from vehicles in need of repair. Hazardous materials used in vehicle maintenance are used and stored on the premises.

When it operated as a repair garage and gas station prior to the adoption of zoning in Barre, the repair garage operated from 6:00 or 7:00 a.m. to 5:00 p.m. on weekdays and until about noon on Saturdays, and was closed on Sundays, while the gasoline

service component opened for business at 6:00 or 7:00 a.m. and stayed open until 8:00 or 9:00 p.m Monday through Saturday, and opened for business at 7:00 or 8:00 a.m. and stayed open until 4:00 or 5:00 p.m on Sundays.

Washington Street is Route 302, a main traffic artery conducting traffic from the east downhill towards the central business district of the City of Barre. Southeasterly and up Washington Street from Applicant=s property, Washington Street is zoned as a Planned Residential zoning district to a depth of a single lot on both sides of Washington Street. On both sides, the lots behind those fronting on Washington Street are zoned in the R-10 Residential zoning district. Northwesterly and down Washington Street from Applicant=s property, the Planned Residential zoning district widens to a depth of several lots on both sides of Washington Street. Approximately three or four blocks up Washington Street from Applicant=s lot, both sides of Washington Street are zoned Commercial. The City=s historic central business district begins approximately the same distance downhill from or northwesterly of Applicant=s property. The area is a mixed use area with residences, professional offices, and some commercial uses. Many of the buildings in the area are nineteenth-century and early-twentieth-century residential buildings, although some have been remodeled or re-sided with later and less-attractive or less-historical materials.

Washington Street carries approximately 8058 vehicles per day, or approximately 975 vehicles per hour in the design hour. Whether the use on the lot is an automobile

service and gas station (at 75 vehicle trip ends for the peak hour counted at this location) or is a convenience store with gasoline pumps as proposed (predicted to be a peak of 78 vehicle trip ends per hour using recognized transportation engineering methods), the use will not appreciably affect the traffic on Washington Street. Moreover, the proposed project will generate less traffic traveling on Washington Street than does the present use as an automobile service type of gas station, because approximately 60% of convenience store/gas station traffic is so-called pass-by traffic. That is, more of the traffic stopping at the proposed convenience store and gas station will be traffic traveling on Washington Street for other purposes than was the case with the automobile service type of gas station. In addition, more customers for the convenience store will travel by foot and bicycle to the property from the surrounding neighborhood, as compared with the customers for the automobile service component of the automobile service type of gas station.

The adjoining property along Washington Street uphill or southeasterly of the Applicant lot is a single-family residence currently with a day care home occupation, also in the Planned Residential zoning district. The adjoining property along Washington Street downhill or northwesterly of the Applicant=s lot is a multiple-unit apartment building. A seven-foot-wide easement runs on the northeasterly portion of the Applicant=s lot, providing access for the apartment residents to a parking lot to serve the apartment

building.  Adjacent to the apartment building lot is a neighborhood market without gasoline service.  Both the apartment and the neighborhood market are also in the Planned Residential zoning district.  The properties across Washington Street are residential.  The windows of the residential building directly across Washington Street from Applicant=s building face the easterly curb cut on Applicant=s property so that the headlights of any vehicles exiting Applicant=s property via that curb cut shine directly into the residential rooms of that building.

The adjoining properties to the southwest along Orange Street are single family residences, located in what one witness described as a charming residential district, in the R-10 Residential zoning district.  They are located at a floor elevation substantially below that of Washington Street.  The glare from the existing lights on Applicant=s property and an existing storage trailer behind the existing building can be seen from at least two of the Orange Street properties.

The new gasoline pumping equipment, adapted to self-service, does not increase the number of existing fueling positions, which remains as four fueling positions.  The equipment is not of a greater size, capacity or productive capacity; that is, no greater amount of gasoline or number of vehicles could as a practical matter be processed through the facility than with the previous equipment.

The floor space >open to the public= does not include the floor space inside the

built-in wall coolers, even if customers are able to reach into the coolers to remove items from them.  The floor space open to the public in the proposed building is approximately 940 square feet, including the retail space and the bathrooms.

I.  Issues not before the Court in the present decision.

Based on the decision in <u>Simendinger v. City of Barre</u>, 171 Vt. 648 (2001), the following two issues were not reopened in the remanded or additional proceedings, and remain the law of the case.  First, the building on the site qualifies for consideration as a pre-existing, noncomplying structure (too close to the front and easterly side setbacks), on a pre-existing undersized lot, housing a pre-existing, nonconforming (repair garage and gasoline service) use.  Second, the proposed neighborhood grocery store satisfied the criteria of '5.14.02(c), allowing Applicant to apply for conditional use approval of the neighborhood grocery store proposal in the remanded proceedings.

The City also asks the Court to revisit its August 7, 2002 summary judgment decision that conversion of the use of the building from automobile service use to convenience store use should be analyzed as an application for a conditional use, <u>in addition to</u> determining whether changes to the gasoline service aspects of the proposal meet the standards of the ordinance for alterations to that preexisting nonconforming use. This Court declines to reverse its August 7, 2002 decision.  Rather, in that decision this

Court very carefully examined this issue and its relation to the Supreme Court=s memorandum decision in Simendinger v. City of Barre, 171 Vt. 648 (2001). (See this Court=s August 7, 2002 decision, at pages 7 through 10, and in particular at page 9.) Under the Zoning Regulations of the City of Barre, a proposal that falls into more than one use category, such as the present proposal, must obtain approval under each and every use category for which it may qualify, as the Zoning Regulations allow more than one use per lot.

Section 5.1.04 governing nonconforming uses and noncomplying structures states the intent of this section to Amaintain the property rights of a parcel of land which has a nonconforming use or noncomplying structure, while at the same time protecting the property rights of the surrounding neighborhood.@ Section 5.1.05(3) allows an undersized lot with an existing Anonconforming structure or noncomplying building@ to be developed for the purposes allowed in the district, Aprovided that the coverage of the building is not enlarged.@ Appeal of Mullen, Docket No. 187-9-00 Vtec (Vt. Envtl. Ct. March 27, 2002).@ The City suggests that its nonconforming use provisions do not comply with current interpretations of state law.

Municipalities may and do take different approaches to regulating nonconforming uses. In re Casella Waste Management, 175 Vt. 335, 338-39 (2003). We must apply the specific requirements of the City=s particular requirements regarding nonconforming

uses and noncomplying structures to the extent possible to make sense of and give meaning to all of its provisions, read as a whole, and to avoid interpreting any of its provisions as surplusage.  Town of Calais v. County Road Commrs., 173 Vt. 620, 621 (2002) (mem.)  We will not invalidate any of the provisions of the Zoning Regulations, even at the request of the City[3] itself, unless there is no alternative interpretation to doing so.

Indeed, we note that at any time after July 1, 2001, when 24 V.S.A. '4443(d) (since recodified as '4449(d)) took effect, the City could have proposed amendments to its Zoning Regulations so that the amended regulations would have been applicable to any new applications not already pending at the time the amendments were proposed.  If the City feels that any of its regulations do not comport with state law, it may certainly choose to amend them.  If the City had wanted to add a requirement that only one use is allowed per lot, or had wanted to define the use category of >neighborhood grocery store,= or had wanted to alter the specific provisions in its Zoning Regulations relating to nonconforming uses, the City could have acted so that those proposed amendments would have been applicable to any applications filed after those amendments were first warned.

The City also renews consideration of another issue concluded in the August 7, 2002 decision on summary judgment: whether '5.1.04(c)(1), regarding maintenance of a

_____

[3]  We do not rule on the City=s standing or lack of standing to request the invalidation of its own regulations.

nonconforming structure, prevents the interior remodeling because it will result in increased use and in increased floor area open to the public. To the extent that this is also a request to reconsider that issue, the Court declines to change the reasoning in that decision: first, '5.1.04(c)(1) is inapplicable; second, even if it were to apply, the proposed renovation does not result in any increase in the >floor area= of the building; and, third, '5.1.04(c)(1) is silent on and does not regulate an increase in intensity of use, as contrasted with '5.1.04(c)(5), which does specifically regulate changes in equipment on the basis of whether the change >intensifies= a nonconforming use. Because it is specifically mentioned in another subsection, we must presume that the ordinance intended not to do so when regulating maintenance under '5.1.04(c)(1).

## II. Conversion from full-service to self-service

As decided in the August 7, 2002 summary judgment decision, the conversion of the gasoline dispensing equipment from full-service to self-service, considered independently of the uses in the building and of any changes to the building, does not involve any structural alterations to the building or any change in location of the pump island. It does not involve any change in the use category of the use as a gasoline station. It only involved the replacement of the pumps themselves with more modern equipment, followed by a change on the equipment to activate the electronic card-reading

function.  For this reason, it must be considered under '5.1.04(c)(5).

The new dispensers, adapted to self-service, do not increase the number of fueling positions.  Further, the dispensers are not of greater size, capacity or productive capacity, and their conversion to self-service only change whether it is the customer or an attendant who is operating the dispenser.  Therefore, the change from full-service to self-service may be accomplished without DRB approval, under the first sentence of '5.1.04(c)(5).

III.  Construction of a canopy over the existing pump island and fueling positions

The City argues that the proposal to construct even a limited canopy over the pump island is impermissible because the pump island is already within the front setback and therefore the canopy would violate the front setback.  Applicant argues from <u>Appeal of Pearl Street Mobil</u>, Docket No. 2001-249 (Vt. Supreme Ct., December 21, 2001) (three-justice panel) that a canopy placed over a nonconforming use is not an enlargement of that use.  However, the reasoning of that decision is inapplicable to the present canopy proposals because in <u>Pearl Street Mobil</u> Athere was no allegation that the canopy would violate any dimensional requirements@ in the City=s zoning regulations.  In the present case, either a canopy over the pump island or a larger canopy would constitute the construction of a new nonconforming structure in the front setback, which is not allowed without a variance unless it can be approved as an alteration of the existing

nonconforming use represented by the pump island, under '5.1.04(c)(2).

Section 5.1.04(c)(2) provides in full that Aa nonconforming use or noncomplying structure may be altered with DRB approval in order to address considerations of energy, safety, environment and health so long as such alteration does not result in increased floor area or increased use.[4] @   That is, it provides a limited exception to the general rule against alteration or expansion of nonconforming uses or structures.

At trial, the parties treated this section as if it provided for alterations of nonconforming uses or structures if and only if the alteration were required to accomplish an improvement in the level of protection of health, safety, the environment, or energy conservation afforded by the project (for example to convert a stairway to an accessible ramp, or to install a berm to protect the municipal sewer system from hazardous spills). In fact, the language of the section allows alternate interpretations.   While the phrase >in order to= may be interpreted to mean >required= or >necessary,= it may also be read to mean merely >convenient= or >useful= to address the listed considerations.   Similarly,

---

[4] Section 5.1.04(c)(2) uses the term >floor area,= which is defined in the regulations to mean the total area, added together, of all floors of a building inside its walls.  The existing pump island is a >structure= but is not a >building.=   The proposed canopy is a >building,= but has no walls, and therefore has no floor area as the term is defined in the regulations.  Thus for structures without walls or roofs, only the prohibition against >increased use= could be applicable as currently written.  Even though it might have made more sense for the other prong to prohibit an increase in footprint rather than or as well as floor area, we cannot rewrite the regulatory language.

while the word >considerations= may be interpreted to mean >regulatory requirements,= it may also be read to mean merely the landowner=s >business preferences= or the >customers= expectations.=

If this section suffers from a similar lack of standards as was disapproved by the Supreme Court in In re Miserocchi, 170 Vt. 320, 325 (2000), and see In re Handy and In re Jolley Associates, 171 Vt. 336, 345-347 (2000), no canopy could be approved as an exception to the general prohibition against expansion of nonconformities.    If read closely, '5.1.04(c)(2) identifies the limited class of purposes intended for an alteration, to allow it to be considered for DRB approval, but requires interpretation to provide even minimal Acriteria for the . . . exception[] under which the board of adjustment may evaluate whether to approve a change in nonconforming use.@ Miserocchi, 170 Vt. at 325.

Because there is a strong policy against the creation of new nonconforming uses and structures, if '5.1.04(c)(2) can properly be applied at all, it only makes sense if the public detriment of a new nonconforming structure must be balanced against an equally significant public benefit to health, safety or the environment, rather than merely being balanced against the convenience of an applicant or its customers.    Using this interpretation, the evidence in the present case supports a finding that the smaller canopy (only over the existing pump island) would improve public safety by allowing the lights to

be recessed, thereby eliminating glare experienced by passing drivers and the surrounding neighborhood, and by protecting the functioning of the fire suppression system.

On the other hand, the proposed larger canopy over the vehicle spaces at the pumps, as well as over the pump island, would only increase customers= convenience in using the facility, but would not increase public safety, health, environmental protection or energy conservation any more than the smaller canopy over the existing pump island. The proposed larger canopy would not decrease safety and environmental risks due to the accumulation of ice and snow, because ice and snow must be cleared by the facility as it now exists, although it would make that job easier for the facility. The evidence does not support a finding that the proposed larger canopy is necessary to achieve compliance with any objective safety, health, energy or environmental requirements imposed on the Applicant by any regulatory authority, such as for disability access, or fire or building code compliance, or to achieve any substantial safety, health, energy or environmental benefits to the public.

This gas station has operated for many years without a canopy. It could operate safely, by reducing glare, if the canopy were limited to extending over the pump island, even though the convenience and comfort of customers= use of self-service equipment and the owner=s ease of operation of the facility would be enhanced by the presence of a larger canopy. Accordingly, only the 4' x 22' canopy as shown on site plans 105, 107

and 108 can be approved; to avoid incompatibility with the neighborhood for this new noncomplying structure, its fascia or edge may not be white in color, but should be a darker color compatible with the color of roof structures in the area.

IV.  Conditional use approval of the neighborhood grocery store use

We determined in the August 7, 2002, summary judgment decision that, even assuming a preexisting level of sales at the level claimed by Applicant and assuming that those sales were never discontinued under '5.1.04(a)(3), they were simply not substantial enough to establish a preexisting neighborhood grocery store use.  No evidence was presented at trial warranting a change in this ruling.  Accordingly, the conversion of the use of the building from automobile service use to neighborhood grocery store use must obtain conditional use approval under '5.32.04.

The neighborhood grocery store use does not adversely affect the capacity of any existing or planned community facilities.  It does not affect any other ordinances or bylaws in effect, other than the increased nonconformity of the proposed roof as discussed in Section V below, and the excessive window size causing excessive lighting, as discussed in Section VI below.

The proposed neighborhood grocery store use will have a negligible effect on traffic on roads or highways in the vicinity, that is, on Washington Street.  It is expected to

experience few if any additional vehicle trips in the peak hours of Washington Street traffic than the vehicle repair garage use, and to generate fewer trips on Washington Street as more of its customers can be expected to be passing by on Washington Street for other purposes anyway.  Turns in and out of the existing curb cuts may be made safely, as long as the gasoline delivery tank truck is scheduled to deliver to the facility during off-peak hours.

The character of the area is a mixed-use area along Washington Street, including residential uses, professional offices, and other neighborhood commercial uses such as another neighborhood market two buildings down Washington Street, many housed in formerly residential buildings.  The conversion of the repair garage to a convenience store will be compatible with and not adversely affect the character of the area in that it will convert the use from a non-conforming commercial use to a conditionally-allowed commercial use.  However, it will only be compatible with the character of the area if its appearance and its operating characteristics are also compatible with a mixed-use residential area.

The appearance of the building will adversely affect the character of the area unless the amount and placement of the glass window area is reduced, due to the excessive amount of light for a residential area emanating through the upper quarter of the

height of glass nearest the ceiling[5], and through the glass corner proposed at the northerly corner of the front of the building. We note that in Exhibit 144, the corner of the building near the street is shown as brick, but on Exhibit 148, showing a reduced amount of glass near the rear of that face of the building, the front corner of the building is shown as glass[6]. To avoid an adverse effect on the character of the area, the front corner will have to be brick on both the face of the building facing the street and on the face of the building facing the gas pumps. To avoid an adverse effect on the character of the area, the panel above the doorway as shown on Exhibits 145 and 148, and an equivalent panel of the top of the window, will have to be brick or some opaque material. In connection with the redesigned windows, to avoid an adverse effect on the character of the area, the windows in the face of the building facing the street will need to be divided in some way, whether as separate windows, with divided lights, or within an arched surround, to break up the commercial appearance of the expanse of glass facing the street.

---

[5] The interior lights are equipped with parabolic reflectors and we specifically find that they will <u>not</u> create glare and specifically find that no lighted signs are proposed to be placed in any of the windows. Rather, this conclusion is based on the appearance of a lit store interior visible through the large expanse of windows.

[6] Moreover, although these two exhibits purport to show the same building at the same scale, a comparison of the two reveals that the length of that side of the building is different by about 5/8" or approximately 6.25 feet. Any revision of the window design to comply with these conditions should address this discrepancy.

If the remaining outdoor lighting in the parking area is changed as proposed, neither the change of use to a convenience store nor the appearance of the building will have an adverse effect on the residential neighborhood on Orange Street, as the visibility and audibility of the uses on the property will be reduced as perceived from Orange Street.

Applicant argues that the Court should not impose any operating hour limitations, but that instead the operating hours will be self-limiting as it will not be profitable to keep the store open after most people in the neighborhood go to bed. However, the Court is charged with the task of imposing or stating conditions so that any approved conditional use will not have certain adverse effects, including on the character of the area. This task may result in a different balance than that reached solely through the economics of an applicant=s operations, or it may not; if the balance always optimized public as well as private interests, there would be no need for an assessment of the effect of any proposal on the character of an area. Applicant=s proposal to open for business at 6:00 a.m. and proposal to operate to 10 p.m. Sunday through Thursday, and to midnight on Friday and Saturday will not adversely affect the character of the area as to the opening times or as to the proposed closing time of 10 p.m. for the convenience store on week nights, but will adversely affect the character of the area as to the late night hours on Friday and Saturday nights, due to the headlights of vehicles leaving the property sweeping across the

front windows of the houses across Washington Street, and due to the appearance of the lighted store interior in the context of the otherwise-darkened neighborhood during the late night hours.

We first must point out that because Applicant=s gasoline service use is a pre-existing, noncomplying use, it may not extend beyond the hours of operation of the former gasoline service use. See Appeal of Smith, 263-12-02 Vtec (Vt. Envtl. Ct., Dec 20, 2004) (slip op. at 3); Franklin County v. City of St. Albans, 154 Vt. 327, 331 (1990) (AIf the nonconforming use was not abandoned, as the trial court concluded, then resumption of activity at the jail to pre-[zoning ordinance] levels, so long as it was within the range of the previous activity and not greater than the maximum activity within that [previous] range, was not an expansion as a matter of law.@) The pre-existing gasoline service component opened for business at 6:00 to 7:00 a.m. and stayed open until 8:00 or 9:00 p.m. Monday through Saturday, and opened for business at 7:00 to 8:00 a.m. on Sundays, closing at 4:00 or 5:00 p.m. on Sunday afternoons. Accordingly, the gasoline service component of Applicant=s operation must observe the hours of 6:00 a.m. to 9:00 p.m. Monday through Saturday, and 7:00 a.m. to 5:00 p.m. on Sunday, independently of the hours established in the conditional use approval of the neighborhood grocery store component of Applicant=s operation[7].

---

[7] The Court understands the practical difficulties that may arise in having different closing hours for the gasoline service than for the convenience store. However, we note that this is not a

The hours of operation of the neighborhood grocery store component of Applicant=s proposal may extend from 6:00 a.m. to 10:00 p.m., so that the interior lights of the building are reduced and the exterior lights are turned off to their nighttime security setting to avoid customers coming onto the property after that time. However, the largely residential character of the surrounding neighborhood precludes the midnight closing hours proposed for Friday and Saturday nights, even though some or even many neighborhood residents may generally tend to stay awake later on those nights. The professional office uses and neighborhood commercial uses are not open at that late hour. Although some traffic continues to travel on Washington Street at all hours, that traffic is not as disturbing to neighboring residences as is the effect of exiting headlights sweeping across the fronts of opposing buildings. Most importantly, the appearance of the well-lit glass front and side store windows is incompatible with the late-night quiet of a predominantly residential neighborhood.

## V. Remodeling of the building as alteration to a nonconforming structure under 5.1.04(b)

---

condition being imposed by the Court, but is rather a consequence of the fact that the gasoline service is the nonconforming use on the lot. It is up to Applicant whether it wishes to avail itself of the somewhat longer hours provided in this decision for the neighborhood grocery store use.

As discussed in the August 7, 2002 summary judgment decision, the proposed remodeling of the building to accommodate the new convenience store use must be considered as a change to a nonconforming structure under '5.1.04, as well as requiring site plan approval.    Under '5.1.04(b) a noncomplying structure may be used and continued, but may not be Amoved, enlarged, altered, extended, reconstructed or restored unless such changes comply with the standards of the district in which such structure is located.@   (Emphasis added).

With regard to the changes to the building=s walls, windows and doors and roof, the building is being reconstructed or altered, as the term alteration is defined in '5.2.03, in that it is undergoing structural change or rearrangement.   The building is a nonconforming structure only as to the front and side setbacks.   None of the proposed window, wall or door remodeling alterations occupy more of these setbacks than did the existing building, so that the proposed remodeling alterations for the walls, windows and doors do comply with '5.1.04(b).   However, not only is the roof proposed to be remodeled or altered, but the roof changes also constitute an enlargement to the building, as the roof is proposed to be raised in height and changed in design from a flat-topped shallow mansard-style roof to a taller >pitched= or hip roof, with a peak over the front door as shown in Exhibits 144, 145 and 148.  Based on the scale of the site plan, more than half of the building is within the 30-foot side setback required for non-residential uses, and

approximately the front third of the building is within the 40-foot front setback required for non-residential uses.  '5.12.04(e), made applicable through '5.14.04.  Thus, although the footprint is not proposed to be enlarged, it appears that, based on the design of the proposed roof in evidence, the proposed roof remodeling alterations occupy more of both setbacks[8] than did the existing building, so that the proposed remodeling alterations for the roof fail to comply [9] with '5.1.04(b).

---

[8]  That is, it occupies more of the volume of the setback area.  See, e.g., Appeal of Tucker, Docket No. 99-399 (Vt. Supreme Ct., March 10, 2000) (three-justice panel, slip op. at 3).

[9]  The problem of whether the enlargement of the roof complies with the setbacks would not arise if the space contained within the roof occupied no more of the setback than did the previous roof, as if a mansard-style roof were designed or redesigned for the remodeled building, or if the taller portions of the roof only occurred beyond the setback areas.

VI. Site plan approval

Applicant has proposed five different site plans representing differences in the number and configuration of the proposed parking and loading spaces, the dumpster, the landscaping, and the canopy (Exhibits 104 through 108), with variations in parking and loading as shown in Exhibits 133 through 135.

The Zoning Regulations incorporate by reference the site plan standards from then-24 V.S.A. '4407(5)[10][10], involving the adequacy of traffic access, circulation and parking; and landscaping and screening.

---

[10][10]  No >other matters= are specified in the bylaws for site plan approval, and the protection of the utilization of renewable energy resources is not at issue in this application.

The parking and loading requirements applicable under Article 7 of the Zoning Regulations must be analyzed separately for the gasoline service use and the convenience store use.[11][11] The gasoline service use is preexisting and under '5.7.01(e) the parking and loading requirements of the regulations do not apply to it. In any event, the four spaces at the pump island (numbered as spaces 1 through 4 on all of the site plans), are adequate to serve the gasoline service function. Even if a customer leaves a vehicle at the pump to go inside to pay, that space will simply be unavailable for a new gasoline customer for that period of time, as drivers of vehicles seeking gasoline service who see congestion at the pumps as they approach the station will simply not stop at that station at that time. Regardless of whether a loading space is designated on-site for the convenience store use, gasoline deliveries must be scheduled to be made during off-peak times to avoid on-site circulation conflicts with the gasoline delivery tanker truck. This may well be Applicant=s practice in any event, but in the present case it must be a condition of any site-plan approval.

As the use of the property as a neighborhood grocery store was not preexisting, '5.7.01(e) does not apply to that use, so that the parking and loading spaces required for

---

[11][11] To the extent that the City was deriving a 15-space parking requirement from this Court=s 1998 decision, that aspect of the 1998 decision was what was reversed and remanded. Moreover, that site-plan analysis was based only on a site plan that proposed the convenience store with a single gasoline dispenser, not now within the current proposals. As to site plan approval of the current proposals, the parking required by the Zoning Regulations is before the Court de novo.

the neighborhood grocery use must be analyzed under Article 7. Under '5.7.01(b)(8) five spaces would be required (one space for every 200 square feet of the 940 square feet of floor space open to the public[12[12]]), plus two spaces for the employees who might both be present at the same time, if only while changing shifts, for a total of eleven parking spaces without the need for a waiver. There is no basis for a waiver of any of the eleven spaces, so that the number of spaces shown in Exhibits 106 and 133-135 cannot be approved.

As less than a thousand square feet of floor space is open to the public, the requirement for a loading space does not apply Aif there is not sufficient space on the lot for an off-street loading space.@ '5.7.03(b). While there are various locations on the lot shown on the different site plans for a loading space, they are not convenient to the building, are not as convenient to the building as it would be for the deliveries to be made from a vehicle parked on the street in front of the building, and contain enough potential for conflict at peak hours to support the Court=s conclusion that the '5.7.03(b) exception should be applied. Under off-peak conditions a delivery vehicle could park close to the building in one of the customer spaces; under peak conditions a delivery vehicle in any of the proposed loading spaces would potentially cause inconvenient maneuvering for customers seeking to use either the fueling positions or the convenience store.

---

[12[12]] This calculation assumes that there would be no seating at the deli counter. If seating were proposed, the calculation would have to be based on one space for every 150 square feet of floor space open to the public, and evidence of the appropriate allocation of the interior space to the deli as opposed to the convenience store would have to be presented.

Accordingly, a designated on-site loading space will not be required for site plan approval, but the scheduling of convenience store deliveries at off-peak hours will be required to avoid on-site circulation conflicts.

On-site pedestrian circulation is adequate for all site plans. If gasoline and other deliveries, and servicing of the dumpster, are scheduled for off-peak times, on-site vehicular circulation is adequate for all site plans if modified as follows. For site plan 104, on-site vehicular circulation is adequate if spaces 11 and 12 as shown on that site plan are reserved for employees <u>or</u> if a paved backing and turning area is added in the location between the end of space 11 and the existing tree line. For site plan 105, on-site vehicular circulation is adequate if space 15 as shown on that site plan is eliminated, and if space 10 as shown on that site plan is reserved for employees. For site plan 106, on-site vehicular circulation is adequate if a paved backing and turning area is added in the location marked >existing grass,= as shown on Exhibits 133 through 135. For site plan 107, on-site vehicular circulation is adequate if space 11 shown on that site plan is reserved for employees. For site plan 108, on-site vehicular circulation is adequate if a paved backing and turning area is added in the location marked >existing grass,= as shown on Exhibits 133 through 135.

With regard to the adequacy of landscaping and screening, '5.7.02 applies Awhere any nonresidential district or use abuts a residential <u>district</u>.@ Emphasis added. It is not

triggered where a nonresidential district or use abuts a residential <u>use</u>; although that might be good policy, it is not what the Zoning Regulation requires. The subject property is a nonresidential use <u>in</u> a residential district. It abuts a different residential district only at the rear, where much more than a fifteen foot strip is suitably screened and landscaped by existing vegetation plus a new line of evergreen screening at the top of the bank. Moreover, this requirement can be met even if the section is read to require that a fifteen-foot-strip be Asuitably screened and landscaped in a reasonable manner@ between the parking areas for Applicant=s nonresidential use and the neighboring residential properties. The proposed addition of juniper shrubs in the easterly front corner of the building adjacent to the single-family residential property, provides suitable landscaping for the single existing parking space in front of the building. On the other side of the property, adjacent to the apartment building property, Applicant=s property provides the right-of-way to and abuts the gravel parking lot for the apartment building. It would not be suitable or reasonable to provide any landscaping or screening along or within that right-of-way; such landscaping or screening would interfere with the use of that easement area by both properties. The single new tree proposed in site plans 105, 107 and 108 next to the light pole in the corner of the property near the corner of the adjacent parking lot provides suitable landscaping for that location. For the site plan 108, some added shrub plantings adjacent to the end of the apartment parking lot in the area shown on site plan 105 would

provide suitable and reasonable landscaping for that location, but it is not suitable or reasonable for such plantings to occupy the full fifteen-foot width, as it would interfere with site circulation on the site and is not necessary for screening as the adjacent area on the apartment lot is also used for parking.

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED that;

1)     Conditional use approval is granted for Applicant=s proposal to convert the building from automobile service station use to neighborhood grocery store use, with the following conditions:

a.     the roof shall be redesigned so that it does not increase the degree to which it occupies space within the setback area;

b.     the fenestration shall be redesigned to reduce the glass area and to make the appearance of the end of the building facing the street compatible with the area as discussed in this decision;

c.     the neighborhood grocery store use may be operated during the hours of 6:00 a.m. to 10:00 p.m., provided that the light levels are reduced promptly by 10 p.m. as discussed in this decision.  The gasoline service use may be operated during the hours of 6:00 a.m. to 9:00 p.m. Monday through Saturday, and 7:00 a.m. to 5:00 p.m. on Sundays.

2) Approval under 5.1.04(c)(2) is granted for a 4' x 22' canopy over the existing pump island; the canopy fascia shall be of a dark color used for roofing in the surrounding area.

3) Site plan approval of Applicant=s proposal is granted for the parking configuration, canopy, lighting, landscaping and screening provided in Exhibit 108, with the changes as discussed in this decision, specifically:

   a. the addition of a paved backup area at the rear of the parking lot next to the dumpster, similar to that shown on Exhibit 133, to provide for on-site circulation and backing up from some of the parking spaces and for access to the dumpster by the garbage truck);

   b. the addition of some plantings adjacent to the boundary with the apartment parking lot in the general area of but closer than 15 feet as shown in Exhibit 105;

   c. provision for gasoline deliveries at off-peak hours, and convenience store deliveries at off-peak hours, to avoid on-site circulation conflicts with the delivery vehicles and to eliminate a designated on-site loading space.

Due to the complexity of this decision, on or before February 11, 2005, Applicant shall submit a proposed judgment order with a revised site plan and revised building elevations consistent with this decision, approved as to form by the City and with copies

supplied to the three unrepresented parties.  Any party may submit any comments on or objections to the proposed judgment order or site plan on or before by February 22, 2005.  As the Court anticipates moving to its new location on approximately February 14, 2005, please call the Court at 802-479-4486 (current number) or 802-828-1660 (new number), as appropriate, to determine the correct address for filing.

Done at Barre, Vermont, this 27th day of January, 2005.

_____
Merideth Wright
Environmental Judge